IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| F.H., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | FILE NO. _____ |
| TARA HOSPITALITY, LLC d/b/a | ) | |
| THE GARDEN INN and | ) | |
| SHASHIREKHA SHETTY, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

COMES NOW Plaintiff in the above-styled action and files her Complaint as follows:

1.

From the end of 2012 through early 2013, when she was 15 years old, Plaintiff F.H. was trafficked for sex at the Garden Inn located at 6701 Shannon Parkway, Union City, Georgia 30291. Given the nature of the case, Plaintiff is identified in this complaint by her initials to prevent public disclosure of her name.

Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

2.

Defendant Tara Hospitality, LLC d/b/a The Garden Inn (hereinafter referred to as "Defendant(s)" or "Tara Hospitality") is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court.  Service can be made on said Defendant by serving its Registered Agent: Shashirekha Shetty, 10855 Chatburn Way, Duluth, GA 30097.

3.

Defendant Tara Hospitality, LLC has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant Tara Hospitality, LLC.

5.

Defendant Shashirekha Shetty (hereinafter referred to as "Defendant(s)") is a resident of Georgia and is subject to the jurisdiction and venue of this Court and

---

[1] Plaintiff has concurrently filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the sex trafficking of F.H. Plaintiff's anonymity will provide for her own personal safety and will protect Plaintiff from the public disclosure of details which are intimate and personal in nature.

may be served at her personal residence located at 6340 Westbrook Avenue, Union City, Georgia 30291.

6.

At all times herein, Defendants owned, operated, maintained, controlled, managed, and/or were responsible for securing The Garden Inn located at 6701 Shannon Parkway, Union City, Georgia 30291, from which they benefited financially.  The Garden Inn contains 46 rooms on three floors, all of which are accessible to the public via uncontrolled stair access.

7.

Defendants knew of the rampant sex trafficking and prostitution at the hotel for years, before, during, and after Plaintiff's trafficking. Defendants knew because:

     a.     the facts of this specific Plaintiff while she was trafficked for sex as a minor child at the hotel;

     b.     its employees knew of and permitted sex trafficking and prostitution to occur at the hotel;

     c.     the facts of multiple other sex trafficking victims at the hotel before, during, and after Plaintiff;

     d.     the frequent and ongoing similar crime occurring at the hotel;

     e.     the reports of hotel guests to Defendants regarding sex trafficking

and prostitution-related activities;

f.    Defendants' knowledge of sex trafficking generally, in the Atlanta

area, and at this location specifically.

8.

A person under the age of 18 cannot consent to having sex in exchange for

money.  Any commercial sex involving a person under eighteen (i.e. "minor sex

trafficking") is *criminal* sex trafficking under federal and Georgia law whether the

minor had a trafficker/pimp and does not require evidence that the victim was

subject to "force, fraud, or coercion."  18 U.S.C. § 1591(a); O.C.G.A. § 16-5-

46(8)(B). Every person who engages in commercial sex with a minor is trafficking

that minor under 18 U.S.C. § 1591(a)(1).

9.

Sex trafficking and prostitution were common occurrences at the Garden Inn

and Defendants chose to ignore, allow, condone, facilitate, support, and/or permit

such activity at the hotel.  Defendants are liable to Plaintiff for their actions and

failures to act.  Defendants' liability to Plaintiff is straightforward:

a)  The Trafficking Victims Protection Reauthorization Act ("TVPRA"),

18 U.S.C. § 1595(a), provides a cause of action to victims of sex

trafficking against "whoever knowingly benefits, financially or by

receiving anything of value from participation in a venture which that

4

person **knew or should have known** has engaged in an act in violation of" the TVPRA.  Defendants knowingly benefited from participation in a venture which they knew or should have known engaged in an act in violation of the TVPRA because in the operation of the hotel, they (i) rented the rooms at the Garden Inn to Plaintiff's traffickers, in which Plaintiff, a 15-year-old girl, was sold for sex at the hotel; (ii) collected fees for rental of those rooms, and (iii) did so notwithstanding that they knew or should have known that Plaintiff was a victim of sex trafficking at the hotel. As such, Defendants are liable to Plaintiff for her damages under the TVPRA.

b) The Garden Inn constituted both public and private nuisances under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, crimes against women, dangerous illegal activity, drugs, violence, harboring missing and runaway underage girls, harboring wanted felons, sex crimes, and sex trafficking. As a direct result of this nuisance, Plaintiff was sold for sex at the Garden Inn, causing her substantial harm.

10.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants and the Garden Inn.

I.   **Plaintiff's Trafficking at the Garden Inn**

11.

Over the course of 4–5 months in 2012, when she was 15 years old, F.H. was sold for sex at the Garden Inn. F.H. had been kidnapped by a sex trafficker and his accomplice. F.H. was held at gunpoint at the Garden Inn and forced to have sex with as many as 20 buyers of sex at the Garden Inn each day. She was often beaten by the trafficker and his accomplice. Plaintiff was falsely imprisoned inside the Garden Inn.

12.

Employees at the Garden Inn assisted and facilitated F.H.'s trafficking. They were friendly with, and interacted frequently with, F.H.'s traffickers. Hotel employees daily brought extra towels to the room for F.H. to clean herself in between being sold. Hotel employees also came directly to the room for rental money. When F.H.'s traffickers did not have the money for the day's room, they

told the hotel employees that they would have the hotel's money after they were able to see some "dates" or "plays," i.e., after F.H. was sold for sex. The hotel allowed the traffickers to stay in their rooms for free, sell F.H., and then pay for the day's room after that. In short, the hotel loaned rooms out to traffickers so the hotel could be paid after some illegal money was raised through trafficking. Defendants knew or should have known that their employees were facilitating trafficking at the hotel, including F.H.'s trafficking.

13.

When Plaintiff was trafficked at the Garden Inn, she saw dozens of other girls and women who were obviously being sold for sex at the hotel. She observed numerous other pimps or traffickers in charge of those girls at the hotel.  These women and children wore lingerie and skimpy clothing throughout the hotel and parking lot and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

14.

As a result of the rampant commercial sex at the Garden Inn, a large number of buyers frequented the hotel each day. Plaintiff estimates that the Garden Inn accommodated more than 100 buyers each day. Defendant knew or should have

known that the number of daily, older male visitors to the hotel was clearly indicative of sex trafficking and child sex trafficking.

15.

Plaintiff and other sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Often, these women and children could be seen loitering on the balcony and walking back to the hotel late at night. Defendants knew or should have known that these were signs of sex trafficking at their hotel.

16.

While Plaintiff was trafficked at the Garden Inn, she was made to have sex with as many as 20 older men each day. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of sex trafficking and child sex trafficking.

17.

While Plaintiff was trafficked at the Garden Inn, the traffickers kept two trash cans in the room. One trash can was kept in the bathroom for trash. The other trash can was kept in the room by the front door and contained *only* condoms and tissues for wiping herself. Thus, every day, the Garden Inn's housekeepers came and collected and emptied a trash can with as many as 20 used condoms each day, every day, for months in a row. Defendants knew or should have known that the

condoms and presence of the minor F.H. were indicative of sex trafficking and child sex trafficking.

18.

While Plaintiff was trafficked at the Garden Inn, each time she was sold for sex—up to 20 times a day—her trafficker pulled a chair out of the room and sat in it outside by the door with a gun. she was made to have sex with as many as 20 older men each day. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of sex trafficking and child sex trafficking.

19.

While Plaintiff was trafficked for sex at the Garden Inn, she exhibited numerous well-known and visible signs of a child sex trafficking victim, of which Defendants knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, loitering, soliciting male patrons, and monitoring and control of Plaintiff by her traffickers.

## I.      Defendants' Knowledge of Prior Crime at the Garden Inn

20.

The Garden Inn was well known for crime, prostitution, and sex trafficking. Defendants had actual and constructive knowledge of criminal activity existing on the property and in the surrounding area prior to Plaintiff's trafficking.

21.

Defendants directly operated the Garden Inn and employed the employees at the Garden Inn since 2006, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that time period.

22.

 Prior to Plaintiff's minor sex trafficking at Garden Inn, prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the hotel, obvious to employees and guests.

23.

Defendants provided a market and beds for sex traffickers to sell women, boys, and girls—including children—to buyers of commercial sex.  That is why Plaintiff's sex traffickers brought her to the Garden Inn to be sold for sex for months.

24.

Prior to Plaintiff's child sex trafficking at the Garden Inn, patrons frequently saw women who were being sold for sex at the hotel loitering outside, soliciting men for sex, and observed the heavy foot traffic surrounding the rooms where sex and drugs were being sold at the hotel.

25.

Defendants knew or should have known of sex trafficking, prostitution, and other criminal activity existing at the Garden Inn prior to Plaintiff's sex trafficking there.

26.

Defendants knew or should have known that in 2014, a 23-year-old female was murdered in a room at the Garden Inn. Hotel employees knew of this murder because they observed the victim earlier in the day and unlocked the room to discover the dead body.

27.

Defendants knew or should have known that in May 2017, two men were in a shootout at the Garden Inn and each killed the other. One died in the hotel room, another later at the hospital.

28.

Defendants knew or should have known that in October 2017, a man was shot and killed at the Garden Inn. During this shooting, a teenager was also shot and injured.

29.

Defendants knew or should have known that in November 2021, a woman engaging in commercial sex at the Garden Inn was attempting to rob buyers at the hotel. These pictures were taken by a buyer, who circled where the gun was located in the picture when he posted about the incident online.





30.

Defendants had actual or constructive knowledge of publicly available online reviews of the Garden Inn reporting prostitution and crime occurring at the hotel, including the following:

(i)     September 20, 2010, from booking.com:

**Horrible Hotel**

"This hotel is horrible. [. . .] Shady characters were hanging around. Was in the area for business, but will never stay here again.  Filthy!"

(ii)    September 7, 2013, from expedia.com:

**Dangerous and Horrible**

"This property is completely miss-represented by their online website which contains mostly pictures of a different property across the street. Entire property is not well maintained. Many unsavory people appearing to just hang out and clear indications of illegal behavior occurring. . .The only time in my life that I felt I had to flee for my own safety. Property is probably a public safety danger."

13

(iii)   <u>September 4, 2017, from yelp.com:</u>

"stay the hell away from here !!! please stay away it is a scam you book online and when you get here they say only jacuzzi room available for more money its nasty as hell people live here little boy followed me asking for money with no shoe strings no towels the Indian woman at the front desk is disgusting and hangs out with the people that live here this damn place shouldnt even be open to the public it's not even 1 star"

(iv)   <u>October 25, 2018, from booking.com:</u>

**If I hadn't been so exhausted I would've left.**

"This was the worst hotel I've ever stayed in . . . There was a wild sex party going on in the room next-door all night. Apparently it's that kind of hotel . . ."

(v)   <u>From 2019, on Google reviews:</u>

"Definitely a terrible place to stay. I paid for a week stay in advance and they put me and my family in a room on the 3rd floor with a 2.yr old and threatening to kick us out over footsteps…so I go to get a refund and they switched they're rates from the weekly rate I was charged to the day to day rate to take more money than they were supposed to. Meanwhile the drug activity and criminal activities are real. I had a random guy I never met knock on my door and wake my kids asking to buy drugs. very TERRIBLE STAY!"

(vi)   <u>From 2020, on Google reviews:</u>

". . . This was the worst hotel I ever stayed at. . . . Pure nasty owners. The owners promote prostitution. The people that live there hang out in the front of the establishment all evening and night which is bad for business. . . ."

(vii)   <u>May 29, 2022, on yelp.com:</u>

"Avoid this place unless you absolutely can't find anything. Most of

14

the "guest" are residents living here . . . The guest were
fighting/arguing followed by what sounded like gunshots. And we
were only here for two nights. . ."

(viii)   June 1, 2023, from priceline.com:

"Very loud at night..several uninvited knocks on the door through out
the night. Possible prostitution could've been in play on a nightly
basis."

(ix)   July 4, 2023, from priceline.com

". . . very bad experience I called at the property an no one has
reached out to me about refunding me nor any accommodations for
the terrible experience with a special needs child while ppl outside of
the location fighting an holding firearms out."

31.

Defendants knew or should have known that these and other customer

reports showing the dangerous nuisance of the property and the rampant crime that

occurred on the premises.

## D.   Defendants' Knowledge of Sex Trafficking Generally

32.

Defendants knew or should have known of the existence of sex trafficking and

its illegality more than 20 years ago, since the passage of the Trafficking Victims

Protection Act in 2000 and the United Nations' adoption of the Palermo Protocol to

prevent, suppress, and punish trafficking in persons.

15

33.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that crime was prevalent in the city, including at the Garden Inn. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[2] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants have received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiff.

---

[2] See Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited Sept. 9, 2024); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30–32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Sept. 9, 2024).

34.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."[4]

35.

Defendants knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

36.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving hotels and motels reported sex trafficking, and another 2.6 percent

---

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Sept. 9, 2024).
[4] *Id.*

reported a combination of sex and labor trafficking.[5] A 2012 study found that 63

percent of trafficking incidents occurred in hotels.[6] And the Polaris Project found

that "75 percent of [trafficking] survivors . . . reported coming into contact with

hotels at some point" during their exploitation.[7] Unfortunately, "94 percent" also

"disclosed they never received any assistance, concern, or identification from hotel

staff."[8]

37.

Defendants knew or should have known that attorneys for the hotel industry

estimated and reported to hotel industry representatives that eight out of ten human

trafficking arrests occur in or around hotels,[9] and that the industry had been warned,

---

[5] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghotline.org/sites/default/files/Hotel%20and%20Motel%20Topical.pdf (last visited Sept. 9, 2021).

[6] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), [https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf].

[7] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Sept. 9, 2024).

[8] *Id.* at 23.

[9] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983].

among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[10]

38.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[11]

39.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

(a)   establish corporate policy and procedures against sexual exploitation of children;

(b)   train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c)   include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

---

[10] *Id.* at 19.
[11] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Sept. 9, 2024).

(d)   provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e)   support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f)   report annually on the company's implementation of Code-related activities.

40.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

41.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a)   persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b)   persons who lack freedom of movement or are constantly monitored;

(c)   persons who have no control over or possession of money or ID;

20

(d)    persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e)    requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f)    the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g)    extended stay with few or no personal possessions in the room;

(h)    excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i)    the same person reserves multiple rooms;

(j)    a room is rented hourly, less than a day, or for an atypical extended stay;

1. a room is rented hourly, less than a day, or for an atypical extended stay;

2. attempts to sell items to or beg from patrons or staff;

3. cars in the parking lot regularly parked backward, so the license plates are not visible;

4. loitering and solicitation of male patrons;

5. waiting at a table or bar and picked up by a male (trafficker or customer);

6. persons asking staff or patrons for food or money; and

7.  persons taking cash or receipts left on tables.

42.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiff's case, Garden Inn, for a fee, provided this market for Plaintiff to be confined and sold.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

43.

Plaintiff incorporates the paragraphs above as if fully restated herein.

44.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

45.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Garden Inn, including the revenue generated for the rooms in which Plaintiff was trafficked.

46.

Defendants participated in a hotel venture and knew or should have known that their operation of the hotel violated the TVPRA by harboring and maintaining Plaintiff so that she could be sold for sex at the Garden Inn.

47.

The venture in which Defendants participated was in or affecting interstate commerce.

48.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives, participated in Plaintiff's minor sex trafficking at the Garden Inn. Defendants should have known of this participation.

49.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the hotel before and while Plaintiff was trafficked for sex at the Garden Inn.

50.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

51.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

52.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

53.

All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## **Count II – Nuisance**

54.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

55.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance.  The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

56.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

57.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual.  However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

58.

O.C.G.A. § 41-1-4 provides that "A private nuisance may injure either a person or property, or both, and for that injury a right of action accrues to the person who is injured or whose property is damaged."

59.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges[12] shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

60.

The Garden Inn's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

61.

The Garden Inn caused or contributed to a blighting effect on the surrounding community, so that the Garden Inn negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Garden Inn, although the effects on each person may have varied.

---

[12] O.C.G.A. § 41-3-1 defines "sexually related charges" to mean trafficking a person for sexual servitude, public indecency, prostitution, keeping a place of prostitution, pimping, pandering, or masturbation for hire.

62.

The illegal prostitution and sex trafficking nuisance occurring at the Garden Inn had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

63.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Garden Inn caused special damages to Plaintiff, as she was the victim of child sex trafficking at Defendants' nuisance motel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiff for all such damages.

**Private Nuisance**

64.

Additionally, or in the alternative, the Garden Inn constituted a private nuisance because its operation at the very least injured the numerous victims of crimes that occurred there, including specifically victims of sex crimes, like Plaintiff.

65.

The Garden Inn created or maintained a continuous or regularly repeated act or condition on the property (of similar past crimes and sex crimes), which caused Plaintiff's injury.

66.

Among other things, Plaintiff's trafficker selected this nuisance motel as a good location to sell Plaintiff for sex because this motel was known to allow such activity to occur and/or the motel failed to enact any measures to stop such activity from occurring.

67.

Thus, as a direct result of this motel being a nuisance, with a history of many repeated crimes occurring at the property, Plaintiff was sold for sex at this motel and was harmed and damaged as a result of same.

**Nuisance per se pursuant to O.C.G.A. § 41-3-1**

68.

The Garden Inn motel constituted a statutory nuisance per se under Georgia law because the motel knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the motel including rampant prostitution, pandering, pimping, and sex trafficking.

69.

Prior to and following the minor sex trafficking of Plaintiff, Defendants failed to act on its knowledge of prior prostitution and sex trafficking, and failed to act to correct, prevent, or warn of the prostitution and sex trafficking occurring at the motel, and the dangerous environment created on the property. Defendants' failure to take appropriate action to remedy or reduce the danger to the public, including Plaintiff, allowed the dangerous environment at the Garden Inn to continue to exist unabated, thereby creating a nuisance that continues to this day.

70.

Plaintiff was directly harmed as a result of the Garden Inn being a nuisance motel that permitted illegal sexual activity to occur there.

71.

Defendants are liable for nuisance (public nuisance, private nuisance, and/or statutory per se nuisance pursuant to O.C.G.A. § 41-3-1) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persists over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## **DAMAGES**

72.

Plaintiff incorporates the paragraphs above as if fully restated herein.

73.

As a proximate and foreseeable result of Defendant's violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a)   Personal injuries;

b)   Past, present and future conscious pain and suffering;

c)   Loss of enjoyment of life;

d)   Medical expenses;

e)   Mental anguish and emotional distress;

f)   Loss of past, present, and future wages;

g)     Incidental expenses;

h)     All special, compensatory, economic, punitive, and other damages

permissible under Georgia and federal law; and

i)     Consequential damages to be proven at trial.

74.

Plaintiff is entitled to an award of punitive damages without limitation or

cap because the actions of Defendants and their employees were willful and

wanton and showed an entire want of care, which raises the presumption of a

conscious indifference to consequences.

75.

Defendants' actions evidence a species of bad faith, were and are stubbornly

litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to

recover her necessary expenses of litigation, including an award of reasonable

attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-

68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all

expenses of litigation and attorneys' fees pursuant to all other Georgia and federal

statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and

against Defendants for the following:

a)     Process issue as provided by law;

b)      Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

c)      Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d)      Plaintiff be awarded a trial by jury; and

e)      Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on September 23rd, 2024.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 236-9784| Facsimile